1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

EDWARD CRANE,

11                                                   Case No. 1:19-cv-00192-SKO

            Plaintiff,

12

      v.                                             ORDER ON PLAINTIFF'S SOCIAL

13                                                   SECURITY COMPLAINT

ANDREW SAUL,

14  Commissioner of Social Security,[1]

15          Defendant.                               (Doc. 1)

16

17  _____/

18

19

20                          **I.      INTRODUCTION**

21          On February 10, 2019, Plaintiff Edward Crane ("Plaintiff") filed a complaint under 42

22  U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of

23  Social Security (the "Commissioner" or "Defendant") denying his applications for disability

24  insurance benefits ("DIB") and Supplemental Security Income (SSI) under the Social Security

25  Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which

26  _____

27  [1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration.  *See*
    https://www.ssa.gov/agency/commissioner.html (last visited by the court on September 12, 2019).  He is therefore
    substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20

28  C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper
    defendant").

1   were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

2   Magistrate Judge.[2]

## II.     BACKGROUND

Plaintiff was born on May 27, 1953, completed eleventh grade, can communicate in English, and previously worked as a caregiver, a metal framer, and a forklift driver. (Administrative Record ("AR") 33, 44, 45, 46, 48, 59, 60, 72, 75, 85, 207, 211, 212, 213, 218, 231, 240.) Plaintiff filed claims for DIB and SSI payments on September 10, 2015, alleging he became disabled on February 15, 2015, due to back injury and leg pain. (AR 24, 28, 72, 73, 75, 82, 83, 85, 94, 95, 104, 105, 116, 125, 189, 207, 212, 231, 240.)

### A.     Relevant Medical Evidence[3]

#### 1.     Doctors Medical Center of Modesto

On September 30, 2015, Plaintiff presented at the emergency department with exacerbation of chronic back pain. (AR 262–74.) He reported a history of intermittent pain that was exacerbated two days before. (AR 262.) The pain was normally located in his right lower back with radiation down the right lower extremity, but as of two days prior the pain was in the upper and lower back and radiated to both extremities. (AR 262.) Plaintiff described the pain as described as sharp, and worse with movement/bending, especially of his upper extremities. (AR 262.) He had not sought medical attention for the pain, as he found it was typically better with rest and over-the-counter pain medication. (AR 262.)

Upon examination, Plaintiff was noted to be in no acute distress and sitting down. (AR 263.) He was able to stand up slowly, initially ambulated slowly, but after a few steps he ambulated normally. (AR 263.) Plaintiff had no spine tenderness to palpation, no "step-off," no deformity, no flank tenderness, and no tenderness in his upper buttock area. (AR 263.) He did have "palpable myofascial knots in the mid-low lumbar paraspinous area on both sides that reproduced pain when palpated." (AR 263.) Plaintiff's straight leg raising test was negative, with normal reflexes and movement. (AR 263.) He was diagnosed with acute exacerbation of chronic low back pain and

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 6, 8.)

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

1  was noted to be "very stable" in the emergency department and "neurologically intact." (AR 264.)

2  Plaintiff was prescribed medication and daily exercises were recommended. (AR 264.)

3  Plaintiff again presented with back pain at the emergency room on March 1, 2016. (AR

4  300–308.) He also complained of an upper abdominal hernia that was bothersome. (AR 300.)

5  Plaintiff described the pain as sharp and radiating and located in his right lumbar spine. (AR 300.)

6  Upon examination, a reducible periumbilical hernia was noted, with tenderness to palpation in

7  Plaintiff's right paralumbar spine and decreased range of motion. (AR 301.) Plaintiff had a positive

8  straight leg raising test on the right side, and a slight antalgic gait. (AR 301.) His sensation and

9  deep tendon reflexes were intact and no saddle parasthesias was noted. (AR 301.) Plaintiff was

10  assessed with a hernia and exacerbation of chronic back pain. (AR 302.) He was provided

11  educational materials related to his conditions and discharged. (AR 302.)

12  **2.    Dale H. Van Kirk, M.D.**

13  On March 9, 2016, consultative examining physician Dr. Van Kirk conducted a

14  comprehensive orthopedic evaluation of Plaintiff at the request of the State agency. (AR 275–79.)

15  Plaintiff complained of a back injury and pain in both of his knees. (AR 275.) Dr. Van Kirk noted

16  Plaintiff's history of back pain beginning ten years earlier when he was doing heavy construction

17  work. (AR 275.) Plaintiff reported treating his pain mainly with rest and medication; he received

18  no chiropractic treatment, physical therapy, acupuncture, or injections to the back. (AR 275.) He

19  also reported limited activities of daily living and physical functions. (AR 275–76.) Dr. Van Kirk

20  observed that Plaintiff sat comfortably in a chair, got up and out of the chair slowly, and walked

21  around the room "without too much trouble," but with a limp. (AR 276.) A vision tested revealed

22  20/40 vision in the left eye and 20/70 in the right eye. (AR 277.) Plaintiff's Romberg test was

23  normal, his tandem talking with one foot in front of the other was satisfactory, he could get up on

24  his toes and heels, and had normal heel-toe gait pattern. (AR 277.) Dr. Van Kirk noted that Plaintiff

25  did not use an assistive device, nor had one been prescribed. (AR 277.)

26  Dr. Van Kirk found that Plaintiff had some decreased range of motion in his lumbar spine

27  but was able to bend over to within eight inches of touching the floor with his long fingers. (AR

28  277.) Plaintiff's straight leg raising test was negative, his motor strength was normal, and his

sensations were grossly intact.  (AR 278.)  Dr. Van Kirk noted Plaintiff's deep tendon reflexes are bilaterally equal, with his patella reflexes at "1+/4."  (AR 278.)  No "ankle jerks" were detected on either side.  (AR 278.)

Dr. Van Kirk diagnosed Plaintiff with "[c]hronic lumbosacral musculoligamentous strain/sprain, likely associated with degenerative disc disease."  (AR 278.)  Dr. Van Kirk concluded that Plaintiff was limited to (1) standing or walking six cumulative hours out of an eight-hour day; (2) lifting and carrying 10 pounds frequently and 20 pounds occasionally; and (3) occasional postural activities.  (AR 278–79.)  Dr. Van Kirk found no limitations on sitting or manipulative activity or with respect to his workplace environment.  (AR 279.)

### 3.   State Agency Physicians

On March 28, 2016, G. Lee, M.D., a Disability Determinations Service medical consultant, assessed Plaintiff's residual functional capacity (RFC)[4] and found that he could occasionally lift and/or carry 50 pounds and frequently 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions.  (AR 78, 88.)  Plaintiff could occasionally climb ladders, ropes, and scaffolds, and perform all other postural activities frequently.   (AR 78–79, 88–89.)   Dr. Lee opined that Plaintiff had no manipulative, visual, communicative, or environmental limitations.   (AR 79, 88–89.)   Upon reconsideration on July 26, 2016, another state agency physician, B. Harris, M.D., reviewed the record and affirmed Dr. Lee's findings.  (AR 100–101, 109–110.)

### 4.   Denise T. Trinh, M.D.

Plaintiff established care with Dr. Trinh on April 20, 2016.  (AR 282, 350.)  He complained of having back pain for several years and a painful umbilical hernia for three years.  (AR 282, 350.)

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Plaintiff's physical examination revealed normal musculoskeletal findings, normal examination of the back with "no costovertebral angle tenderness," no sensory abnormalities, normal motor strength, normal gait and stance, and normal deep tendon reflexes.  (AR 285, 353.)  Dr. Trinh assessed Plaintiff with an umbilical hernia, urinary incontinence, lumbago, disturbance of gait, and nicotine dependence.  (AR 286, 354.)

An x-ray of Plaintiff's lumbar spine performed on May 2, 2016 revealed degenerative disc disease at L5-Sl with some degenerative arthritis in the right facet joint at L5-Sl.  (AR 311, 367.) It showed with loss of the usual lumbar lordosis and possible mild retrolisthesis of L4 to L5, but otherwise negative lumbosacral spine.  (AR 311, 367.)  The x-ray of Plaintiff's thoracic spine performed that same day was normal.  (AR 312, 368.)

Plaintiff presented for a follow up appointment with Dr. Trinh on May 20, 2016, complaining of chronic, radiating back pain in his lower and mid back that "comes and goes" and is worse in certain positions.  (AR 288, 344.)  Plaintiff reported that his pain is relieved with pain medications.  (AR 288, 344.)  Upon examination, Dr. Trinh noted that Plaintiff's gait was abnormal and "shuffling," with "small steps/strides."  (AR 292, 348.)  His physical examination was otherwise normal, with normal examination of the back and musculoskeletal system, no sensory abnormalities, normal motor strength, and normal deep tendon reflexes.  (AR 291–92, 347–48.) Dr. Trinh performed a vision test, which showed Plaintiff had 20/70 vision in his right eye, 20/30 vision in his left eye, and 20/40 vision in both eyes.  (AR 291, 347.)  She assessed Plaintiff with visual impairment in both eyes, lumbago, muscle spasm, and disturbance of gait.  (AR 292, 348.) Dr. Trinh referred Plaintiff to an ophthalmologist, noting that he had never been to one.  (AR 292, 348.)  She also referred him to a physical therapist for his low back pain and prescribed a cream and medications.  (AR 292, 348, 365, 366.)

On June 15, 2016, a magnetic resonance imaging (MRI) scan was performed of Plaintiff's lumbar spine, which showed "[s]evere discogenic disease and severe facet arthritis at L5-SI, with "[c]ircumferential disc osteophyte bulging into the left far lateral zone, contacting the left LS nerve root, which may be incidental."  (AR 310, 364.)  The MRI noted that there was "[n]o provided history [of] left-sided radiculopathy."  (AR 310, 364.)  "Minor annular bulging with severe facet

arthritis" were present at L4-L5, with "annular bulging with left foraminal extension at L3-L4, which contacts the left L3 emerging nerve root, but without root compression or root displacement." (AR 310, 364.)

Plaintiff presented for another appointment with Dr. Trinh on July 14, 2016. (AR 338–43.) Dr. Trinh noted that Plaintiff is "legally blind" and presented to follow-up on his chronic back pain of his lower/mid back, to request an evaluation and disability form to be filled out, for pain management, and to follow-up on the results of his MRI. (AR 338.) Plaintiff indicated that his back pain is relieved by medications, and he denied any bowel incontinence, numbness, or weakness. (AR 338.) Dr. Trinh noted that Plaintiff has a "history of abnormal gait and ambulates with a walker," but he "did not bring walker into clinic today." (AR 338.) Dr. Trinh further noted that Plaintiff had not started physical therapy for his abnormal gait and that he denied a history of falls. (AR 338.) Upon examination, Dr. Trinh noted that Plaintiff's gait was abnormal and "shuffling," with "small steps/strides." (AR 342.) His physical examination was otherwise normal, with normal examination of the back and musculoskeletal system, no sensory abnormalities, normal motor strength, and normal deep tendon reflexes. (AR 341–42.) Dr. Trinh again referred Plaintiff to a physical therapist for his low back pain and prescribed medications. (AR 342, 360.)

On August 1, 2016, Dr. Trinh completed a one-page "Questionnaire," in which she found that Plaintiff's primary impairment was "severe vision impairment," citing a vision screen of 20/50 in the left eye, 20/100 in the right eye, and 20/50 in both eyes. (AR 361.) Dr. Trinh opined Plaintiff was limited to lifting and carrying 25 pounds two to three hours over an eight-hour day; sitting three to four hours at one time; standing and/or walking three to four hours at one time; sitting eight hours in an eight-hour period; and standing and/or walking four hours in an eight-hour period. (AR 361.) Dr. Trinh opined Plaintiff had been disabled to the degree set forth by her limitations as of April 13, 2016. (AR 361.) Dr. Trinh also completed a psychiatric medical source statement, in which she found that Plaintiff had moderate limitations in the ability to receive and carry out instructions from supervisors, mild limitations in all other work-related mental functions, and opined he was likely to miss one day per month due to mental issues. (AR 362.)

**5.      Penny Greaves, F.N.P.**

On September 12, 2017, Plaintiff presented to Nurse Practitioner ("N.P.") Greaves on for a physical and treatment for back pain and a hernia.  (AR 326–30.)  He reported that he was seen by Dr. Trinh for his back pain but had not seen her in over a year.  (AR 326.)   Upon physical examination, N.P. Greaves noted the existence of an epigastric hernia.  (AR 328.)   Plaintiff's physical examination was otherwise normal, including normal sensation, normal deep tendon reflexes, normal musculoskeletal, and normal balance and gait.  (AR 328.)   N.P. Greaves noted that Plaintiff's mental examination showed he was anxious, fearful, and had "[f]light of ideas," but he was otherwise normal with normal insight, judgment, mood, affect and orientation, and no agitation, anhedonia, or hallucinations.  (AR 328.)  N.P. Greaves assessed Plaintiff with anxiety but noted that he refused to complete a patient health questionnaire related to generalized anxiety disorder, and that he also declined a prescription of Wellbutrin for stress.  (AR 330.)

Plaintiff presented for another appointment with N.P. Greaves on October 2, 2017, and complained of back pain.  (AR 322–25.)  Plaintiff's examination showed lumbar lordosis with decreased mobility, a positive straight-leg raising test on the right, and painful passive dorsiflexion in Plaintiff's right foot.  (AR 323.)   The examination also showed no kyphosis or posterior tenderness in Plaintiff's spine, normal deep tendon reflexes, and normal mood, orientation, and affect.  (AR 323–24.)  N.P. Greaves referred Plaintiff to physical therapy for his lumbago with sciatica and recommended that he use a heating pad or warm shower to relax muscles.  (AR 324.) She also assessed Plaintiff with hypertension and recommended exercise, regular intake of fruits and vegetables, and avoiding salty foods.  (AR 324.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's applications for benefits initially on March 29, 2016, and again on reconsideration on July 26, 2016.  (AR 116–20, 125–29.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 130–47.)  At the hearing on November 9, 2017, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions.  (AR 44–65.)

///

### 1.      Plaintiff's Testimony

Plaintiff testified he is unable to work because he cannot reach with his arms without his back "locking up." (AR 53.) According to Plaintiff, when his back locks up, he is incapacitated for a while. (AR 53.) He testified he also has pain in his legs. (AR 54.) Plaintiff he reported he sees a doctor twice a month for his back and for treatment for hepatitis C—which his doctor diagnosed last month, but has not yet received treatment. (AR 55.) According to Plaintiff, his doctor is also screening him for hepatitis B. (AR 55.) Plaintiff testified that he has problems with his vision, and that he had new glasses but lost them. (AR 58.)

Plaintiff testified that he can walk 20 minutes at one time before needing to sit and is able to walk an hour in an eight-hour day. (AR 55.) Plaintiff can stand 15 to 20 minutes at one time and stand one to two hours total in an eight-hour day. (AR 56.) He testified he is unable to sit for more than 20 minutes at a time and can only sit for an hour total in an eight-hour day before his low back starts to hurt. (AR 56.) According to Plaintiff, he often switches between sitting and standing as well as reclines to keep from using his back as much as possible. (AR 56–57.) Plaintiff testified he has difficulty holding his 18-pound granddaughter, but he could lift about 20 pounds. (AR 57.) According to Plaintiff, he would be unable to do his former work as a forklift driver because of vision difficulties. (AR 59–60.) Plaintiff testified he would be unable to do his caregiver job because his sons had helped him when he was a caregiver for his now-deceased wife. (AR 60.)

Plaintiff testified that on a typical day, he makes breakfast, takes his medication, and stays in the house until the afternoon when he may go to the grocery store. (AR 47.) Otherwise, he does not do very much. (AR 47.) According to Plaintiff, his girlfriend does the laundry, housework and cooking. (AR 48.) Plaintiff testified that it takes him a long time to wash dishes because he must sit due to pain in his legs after standing for a long time. (AR 60–61.)

No doctor has ever suggested surgery or injections for his back. (AR 53, 57.) Plaintiff testified he had an appointment for physical therapy but had not yet gone. (AR 54.) Regarding why he had not seen his doctor for a year, he testified he had insurance issues and there was a six-month waiting period to see a doctor. (AR 54.) Plaintiff testified he takes warm showers to help

with his back, and he takes twice-daily showers for four days a week.  (AR 61–62.)  Plaintiff

reported he also takes medication and lies down for at least 30 minutes, but he must change

positions while lying down.    (AR 62–63.)    According to Plaintiff, he takes Ibuprofen and

Baclofen.  (AR 63.)  He testified he smokes about five cigarettes a day, smokes marijuana "not

quite" daily, and has a history of smoking crack.  (AR 58–59.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that he had identified Plaintiff's past

relevant work as a caregiver, Dictionary of Operational Titles (DOT) code 354.377-014, which was

medium exertional work with a specific vocational preparation (SVP)[5] of 2, and as a truck driver,

DOT code 905.663-014, which was heavy exertional work with a SVP of 4.  (AR 64–65.)  The

ALJ asked the VE in the first hypothetical to consider a person of Plaintiff's age, education, and

work history, who was limited to lifting and carrying 25 pounds frequently and 50 pounds

occasionally; standing and/or walking for about six hours in an eight-hour workday; sitting for

about six hours in an eight-hour workday; occasional climbing of ladders, ropes, and scaffolds,

balancing, stooping, kneeling, crouching, and crawling; and frequent climbing of ramps and stairs.

(AR 66.)  The VE testified that Plaintiff could perform his past work as a caregiver.  (AR 66.)  The

VE testified further testified that such a person could perform other work in the national economy

such as: kitchen helper, DOT code 318.687-010, medium exertional work with a SVP of 2, and

with 502,000 jobs available nationally; laundry worker, DOT code 361.684-014, medium

exertional work with a SVP of 2, with 199,000 jobs available in the national economy; and hand

packager, DOT code 920.587-018, medium exertional work with a SVP of 2, with 661,000 jobs

available nationally.  (AR 67.)

Plaintiff's counsel asked the VE to consider a second hypothetical, of whether the person

in the first hypothetical was limited to light work.  (AR 68–69.)  The VE testified that such a person

could not perform Plaintiff's past work.  (AR 69.)  For a third hypothetical, Plaintiff's counsel

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

asked the VE to consider whether a requirement of three additional 15-minute breaks would preclude work, and the VE answered affirmatively.  (AR 69.)  When asked by Plaintiff's counsel, the VE testified that he was not aware of any jobs at the medium or heavy level that provide for a sit/stand option and has no opinion on whether any exist.  (AR 69.)

## C.      The ALJ's Decision

In a decision dated January 10, 2018, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 24–35.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.  (AR 26–35.)  The ALJ decided that Plaintiff met the insured status requirements of the Act through March 31, 2019, and had not engaged in substantial gainful activity since February 15, 2015, the alleged onset date (step one).  (AR 26.)  At step two, the ALJ found Plaintiff's impairment of degenerative disc disease of the lumbar spine with pain radiating to the legs to be severe.  (AR 26–27.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 27.)

The ALJ then assessed Plaintiff's RFC and applied that assessment at steps four and five. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform medium work as defined in 20 C.F.R. [§§] 404.1567(c) and 416.967(c) except as follows: he is able to lift and carry twenty twenty-five pounds frequently and fifty pounds occasionally.  He is able to sit for at least six hours of an eight-hour workday.  He is able to stand and/or walk for at least six hours of an eight-hour workday.  He is limited to occasional climbing of ladders, ropes and scaffolds.  He is limited to frequent climbing of ramps and stairs.  He is limited to occasional balancing, stooping, kneeling, crouching and crawling.

(AR 27–32.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to produce the . . . alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not consistent with the medical evidence and other evidence in the record."  (AR 29.)

//

10

1    Based on this RFC assessment, the ALJ found that Plaintiff was able to perform his past

2 relevant work as a caregiver (step four).  (AR 33.)  The ALJ also made the alternative finding at

3 step five that Plaintiff retained the capacity to perform other work that existed in sufficient numbers

4 in the national economy, such as kitchen helper, laundry worker, and hand packager.  (AR 33–34.)

5 Ultimately, the ALJ concluded that Plaintiff was not disabled at any time through the date of her

6 decision.  (AR 34–35.)

7    Plaintiff sought review of this decision before the Appeals Council, which denied review

8 on October 17, 2018.  (AR 15–20.)  Therefore, the ALJ's decision became the final decision of the

9 Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

10                    **III.     LEGAL STANDARD**

11   **A.    Applicable Law**

12    An individual is considered "disabled" for purposes of disability benefits if he or she is

13 unable "to engage in any substantial gainful activity by reason of any medically determinable

14 physical or mental impairment which can be expected to result in death or which has lasted or can

15 be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

16 However, "[a]n individual shall be determined to be under a disability only if [her] physical or

17 mental impairment or impairments are of such severity that he is not only unable to do his previous

18 work but cannot, considering his age, education, and work experience, engage in any other kind of

19 substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

20    "The Social Security Regulations set out a five-step sequential process for determining

21 whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*,

22 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.

23 The Ninth Circuit has provided the following description of the sequential evaluation analysis:

24    In step one, the ALJ determines whether a claimant is currently engaged in
     substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ
25    proceeds to step two and evaluates whether the claimant has a medically severe
     impairment or combination of impairments.  If not, the claimant is not disabled.  If
26    so, the ALJ proceeds to step three and considers whether the impairment or
     combination of impairments meets or equals a listed impairment under 20 C.F.R. pt.
27    404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If
     not, the ALJ proceeds to step four and assesses whether the claimant is capable of
28

1
2
3

performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis."  *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work."  *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ."  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a

specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.     DISCUSSION

Plaintiff contends that the ALJ erred in two ways. First, Plaintiff claims the ALJ erred in her treatment of the medical opinions of consultative examiner Dr. Kirk and treating physician Dr. Trinh, leading to a failure to properly assess Plaintiff's RFC. (*See* Doc. 16 at 10–16; Doc. 20 at 1–7.) Second, Plaintiff asserts that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's testimony and statements regarding his subjective complaints. (*See* Doc. 16 at 18–20; Doc. 20 at 7.)

Defendant counters that that the ALJ properly rejected the medical opinion evidence as unsupported by and inconsistent with the treatment notes and examinations in the record, and that she properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms. (*See* Doc. 19 at 14–29.)

### A.     The ALJ Did Not Err in Formulating Plaintiff's RFC

#### 1.     Legal Standard

The RFC is the "maximum degree to which [a plaintiff] retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. 404, Subpt. P, App. 2 § 200(c). It is an administrative decision as to the most a plaintiff can do, despite his limitations. Social Security Ruling ("SSR") 96–8p. The ALJ must assess all of the relevant evidence, including

evidence regarding symptoms that are not severe, to determine if the claimant retains the ability to work on a "regular and continuing basis," *e.g.*, eight hours a day, five days a week. *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998); *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995); SSR 96–8p. The RFC assessment must be based on all of the relevant evidence in the case record, such as medical history; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (*e.g.*, side effects of medication); reports of daily activities; lay activities; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from work attempts; need for structured living environment; and work evaluations. SSR 96–8p.

In making an RFC determination, the ALJ shall set out a detailed and thorough summary of the facts and conflicting clinical evidence, state any interpretations, and make findings. *Morgan v. Comm'r of Social Sec. Admin.,* 169 F.3d 595, 600–01 (9th Cir. 1999) (citation omitted). An ALJ is not required to discuss all the evidence presented, but must explain the rejection of uncontroverted medical evidence, as well as significant probative evidence. *Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation omitted). In addition, "an explanation from the ALJ of the reason why probative evidence has been rejected is required so that . . . [the][C]ourt can determine whether the reasons for rejection were improper." *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981) (internal citation omitted). *See also Flores v. Shalala,* 49 F.3d 562, 571 (9th Cir. 1995) (The "ALJ's written decision must state reasons for disregarding [such] evidence.")

### 2.   The ALJ Appropriately Assessed the Opinions of Drs. Van Kirk and Trinh

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court

considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick*, 157 F.3d at 725). "The ALJ must do more than state conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund*, 253 F.3d at 1157[6], except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

### a. Consultative Examiner Dr. Van Kirk

Following an examination in March 2016, consultative orthopedist Dr. Van Kirk opined that Plaintiff was limited to standing or walking six cumulative hours out of an eight-hour day; lifting and carrying 10 pounds frequently and 20 pounds occasionally; and occasional postural

---

[6] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. §§ 404.1527, 416.927.

activities.  (AR 278–79.)  Although not *specifically* identified by the ALJ as a basis for its rejection, Dr. Van Kirk's opinion is contradicted by the medical opinion evidence of Disability Determinations Service medical consultants Drs. Lee and Harris.[7]  Drs. Lee and Harris opined that Plaintiff could occasionally lift and/or carry 50 pounds and frequently 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions.  (AR 78, 88.)  Thus, the ALJ was required to set forth "specific and legitimate reasons," supported by substantial evidence, for rejecting Dr. Van Kirk's opinion.

In reviewing the medical evidence and giving "little weight" to the opinion in part,[8] the ALJ stated that Dr. Van Kirk's opined limitations were "inconsistent with the skimpy treatment records both before and after the consultative examination," including the "physical examinations in treatment records that showed findings such as normal examination of the hack, normal musculoskeletal system findings overall, no sensory abnormalities, normal motor strength and normal deep tendon reflexes."  (AR 32.)  The ALJ further noted that Dr. Van Kirk's opinion was based on a "one-time examination of [Plaintiff] with no review of [Plaintiff's] treating medical records."  (AR 32.)

The Court agrees with Plaintiff (*see* Doc. 16 at 11) that rejecting Dr. Van Kirk's opinion because it was based on "a one-time examination" of Plaintiff is improper: if a limited treating relationship constituted a legitimate reason for rejecting an opinion from an examining source, such opinion would *always* be rejected, because the relationship between a claimant and an examining physician is generally limited to a single examination, rendering that opinion worthless.  *See Grayson v. Astrue*, No. 2:11–cv–1656–EFB, 2012 WL 4468406, at *5 (E.D. Cal. Sept. 25, 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (holding that while a limited treating relationship may be a valid reason for not according a treating physician's "findings the conclusive

---

[7] The ALJ accorded the opinions of Drs. Lee and Harris "great weight," noting that they "supported their assessments with the minimal findings of physical examinations" and their opined limitations "were consistent with the gaps in treatment and the absence of persistent treatment . . . ."  (AR 31.)

[8] The ALJ did adopt some of the limitations opined by Dr. Van Kirk, namely "occasional climbing of ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling," based on Plaintiff's MRI findings.  (*See* AR 32.  *See also* AR 310, 364.)

weight of a treating medical-source opinion, . . . it is not by itself a basis for rejecting them—otherwise the opinions of consultative examiners would essentially be worthless . . . .")).

An ALJ may, however, discount an examining physician's opinion that is not supported by the medical record. *See Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Here, the ALJ properly rejected Dr. Van Kirk's March 2016 assessment of Plaintiff because she found it was not supported by the objective medical evidence and other evidence, particularly Plaintiff's normal physical examination findings from the time period both before and after that assessment. As the ALJ noted (AR 29), Plaintiff's physical examination in September 2015 showed normal ambulation after a few steps. (AR 263.) Plaintiff had no spine tenderness to palpation, no "step-off," no deformity, no flank tenderness, and no tenderness in his upper buttock area. (AR 263.) His straight leg raising test was negative, with normal reflexes and movement. (AR 263.). The ALJ further noted (AR 29) that Plaintiff's physical examination in March 2016, performed eight days before Dr. Van Kirk rendered his opinion, showed intact sensation, intact, deep tendon reflexes and no saddle parasthesias. (AR 301.)

Other medical evidence identified by the ALJ from the time period after Dr. Van Kirk's assessment also fails to support his opined limitations. As the ALJ pointed out (AR 29–30), Plaintiff's physical examination in April 2016 revealed normal musculoskeletal findings, normal examination of the back with "no costovertebral angle tenderness," no sensory abnormalities, normal motor strength, normal gait and stance, and normal deep tendon reflexes. (AR 285, 353.) Physical examinations in May and in July 2016 were otherwise normal, with normal examination of the back and musculoskeletal system, no sensory abnormalities, normal motor strength, and normal deep tendon reflexes. (AR 291–92, 341–42, 347–48.) When Plaintiff again presented for treatment in September 2017 (*see* AR 30–31), he continued to exhibit normal physical examination findings, including normal sensation, normal deep tendon reflexes, normal musculoskeletal, and normal balance and gait. (AR 328.) A physical examination in October 2017 showed no kyphosis or posterior tenderness in Plaintiff's spine and normal deep tendon reflexes. (AR 31, 323–24.)

1     Plaintiff asserts that the ALJ improperly substituted her own lay opinion as that of a medical

2   source or otherwise improperly imposed her own lay interpretation of the medical evidence.  (*See*

3   Doc. 16 at 12.)  This argument is unavailing.  Although an ALJ may not base his or her decision

4   on "his [or her] own [medical] expertise," *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982),

5   the ALJ, however, is free to choose "between properly submitted medical opinions," or, as here,

6   between a medical opinion and other objective medical evidence in the record.  *Gober v. Matthews*,

7   574 F.2d 772, 777 (3rd Cir. 1978).  In this case, the ALJ did not improperly substitute her lay

8   opinion for that of a medical doctor, but rather properly exercised her responsibility to evaluate the

9   medical evidence in the record: she discussed the evidence presented, noted where the medical

10   opinions were contradictory, and provided reasons for giving particular opinions less weight.  *See*

11   *Reddick*, 157 F.3d at 722 (ALJ has duty to determine credibility and resolve ambiguities and

12   conflicts in medical evidence); *see also Morgan*, 169 F.3d at 601, 603; *Sample v. Schweiker*, 694

13   F.2d 639, 642 (9th Cir. 1982).

14     In sum, the ALJ identified ample medical evidence in the record that undermines Dr. Van

15   Kirk's opinion that Plaintiff is limited to lifting and carrying 10 pounds frequently and 20 pounds

16   occasionally and can only occasionally climb ramps and stairs.  This is a specific, legitimate reason

17   supported by substantial evidence for discounting the opinions of Dr. Van Kirk.  *See Magallanes*,

18   881 F.2d at 751; *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Batson*, 359

19   F.3d at 1195.  As the Court may neither reweigh the evidence nor substitute its judgment for that

20   of the Commissioner, it will therefore not disturb the ALJ's finding on this basis, even if, as Plaintiff

21   points out (*see, e.g,* Doc. 16 at 12), some of the above-described evidence could be construed more

22   favorably to him.  *See Robbins*, 466 F.3d at 882; *Thomas*, 278 F.3d at 954 (Where the evidence is

23   susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must

24   be upheld.); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or

25   reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.").

26              **b.       Treating Physician Dr. Trinh**

27     It is uncontested that Dr. Trinh treated Plaintiff, and thus is considered a treating physician.

28   She opined, in a single-page questionnaire, that Plaintiff's "primary impairment" was "severe

vision impairment," and that, as of April 13, 2016, he was limited to lifting and carrying 25 pounds two to three hours over an eight-hour day; sitting three to four hours at one time; standing and/or walking three to four hours at one time; sitting eight hours in an eight-hour period; and standing and/or walking four hours in an eight-hour period.  (AR 361).  Like Dr. Van Kirk's assessment, Dr. Trinh's opinion is contradicted by the medical opinion evidence of Disability Determinations Service medical consultants Drs. Lee and Harris. (AR 78, 88.)  Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Trinh's opinion.

In giving "little weight" to Dr. Trinh's opinion, the ALJ explained that the opined limitations were inconsistent with her physical examinations and treatment records and were based on a limited treatment history of four months.  (AR 32.)  As with an examining physician's opinion, an ALJ may properly discount an opinion by a treating physician that is not supported by the medical record—including their own treatment notes.  *See Valentine*, 574 F.3d at 692–93 (contradiction between physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss*, 427 F.3d at 1216 (same); *Batson,* 359 F.3d at 1195; *Thomas*, 278 F.3d at 957; *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (ALJ properly rejected medical opinion where doctor's opinion was contradicted by his own contemporaneous findings); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion.").  Here, although Dr. Trinh opined that Plaintiff had significant limitations in lifting, carrying, sitting, standing, and walking (AR 361), the ALJ noted (AR 32) that Dr. Trinh's physical examination records in April, in May, and in July 2016 showed at most a "shuffling" abnormal gait (AR 292, 342, 348), and were otherwise consistently normal with respect to Plaintiff's back and musculoskeletal system, sensation, motor strength, and deep tendon reflexes  (AR 285, 291–92, 341–42, 347–48, 353.)  Dr. Trinh also indicated in her opinion that Plaintiff was disabled as result of her limitations as of April 13, 2016 (AR 361)—one week *before* she saw Plaintiff for the first time (*see* AR 282, 350 (showing Plaintiff established care with Dr. Trinh on April 20, 2016)).

1    In addition, Dr. Trinh opined that Plaintiff's "severe vision impairment" was his "primary

2  impairment" even though her July 2016 treatment record indicated "[n]o vision problems" (AR

3  340) and, in May 2016, her treatment records indicated Plaintiff had 20/70 vision in his right eye,

4  20/30 vision in his left eye, and 20/40 vision in both eyes.  (AR 291, 347.)  Moreover, as Plaintiff

5  concedes (*see* Doc. 16 at 14), none of Dr. Trinh's opined limitations were based on Plaintiff's

6  "primary" vision impairment.

7    Dr. Trinh's one-page psychological mental source statement, in which she opines that

8  Plaintiff was moderately limited in the ability to receive and carry out instructions from supervisors

9  and that he was likely to miss one day per month due to mental issues (AR 362), was equally

10  unsupported.  As the ALJ observed, Plaintiff's psychological examinations in September 2015 (AR

11  263) and October 2017 (AR 324) were normal.  More importantly, Plaintiff repeatedly reported to

12  Dr. Trinh that he had no psychological symptoms (*see* AR 284, 287, 290, 293, 341, 346, 349, 352,

13  355.), which is consistent with his hearing testimony.[9]

14    Finally, the ALJ did not err in discounting Dr. Trinh's assessment because it was based on

15  only four months of treatment.  As noted above, the ALJ gave little weight to Dr. Trinh's opinion

16  because "she did not have a significantly length treatment history with [Plaintiff] such that she was

17  able to provide a solid longitudinal assessment of his limitations."  (AR 32.)  In assigning weight

18  to a treating physician's opinion, the regulations expressly permit an ALJ to consider the length

19  and frequency of the treatment relationship.  *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i)

20  ("When the treating source has seen you a number of times and long enough to have obtained a

21  longitudinal picture of your impairment, we will give the source's opinion more weight than we

22  would give it if it were from a nontreating source.").  In this instance, as the ALJ correctly points

23  out, Plaintiff first established care with Dr. Trinh on April 20, 2016, only four months before she

24  rendered her opinion.  (*See* AR 32.  *See also* AR 282, 350.)

25    The Court concludes that the ALJ has set forth substantial evidence for discounting Dr.

26  Trinh's opinion on grounds that it was not supported by the medical record, including her own

27  treatment notes.  This, coupled with the lack of treating history to support the opinion, *see* 20 C.F.R.

28

[9] Plaintiff testified at the hearing before the ALJ that he was not making any mental allegations.  (AR 57.)

§§ 404.1527(c)(2)(i), 416.927(c)(2)(i), is a specific, legitimate reason supported by substantial evidence for discounting the opinion of Dr. Trinh.  *See Valentine*, 574 F.3d at 692–93; *Bayliss*, 427 F.3d at 1216; *Batson,* 359 F.3d at 1195 (9th Cir. 2004).

Because the ALJ properly weighed the opinion evidence, the Court finds that the ALJ's RFC assessment is error free.  While Plaintiff may disagree with the RFC, the Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of the evidence.  *See Thomas*, 278 F.3d at 954.

**B.      The ALJ Properly Found Plaintiff Less Than Fully Credible**

**1.      Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id*.  The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom."  *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id*.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties

1    concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Social*

2    *Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

3          The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

4    demanding required in Social Security cases.'"  *Garrison*, 759 F.3d at 1015 (quoting *Moore v.*

5    *Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General findings are not enough

6    to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence

7    undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014)

8    (quoting *Lester*, 81 F.3d at 834).

9          **2.    Analysis**

10         As set forth above, the ALJ found Plaintiff's "medically determinable impairments could

11   reasonably be expected to cause the alleged symptoms."  (AR 29.)  The ALJ also found that

12   "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these

13   symptoms are not consistent with the medical evidence and other evidence in the record."  (AR

14   29.)  Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be

15   expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided

16   "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding.  *See Vasquez*,

17   572 F.3d at 591.  Here, the ALJ found Plaintiff's credibility was undermined by several factors:

18   gaps in his treatment history; prescription of conservative treatment; and his noncompliance with

19   prescribed treatment.  (AR 29–31.)  The Court takes each finding in turn.

20         **a.    Gaps in Treatment**

21         First, the ALJ noted that the "record revealed gaps in treatment, which is inconsistent with

22   [Plaintiff's] alleged restrictions."  (AR 29.  *See also* AR 30 (noting "another significant gap in

23   treatment").)  The record shows that despite Plaintiff's alleged disability beginning February 15,

24   2015, Plaintiff did not receive primary treatment until April 2016 and, even then, there is a

25   significant gap in his treatment record from July 2016 to September 2017.

26         "An ALJ may properly discount a plaintiff's credibility based on an unexplained failure to

27   seek treatment consistent with the alleged severity of the subjective complaints."  *Bunnell v.*

28   *Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991.  Plaintiff asserts that it was improper for the ALJ to

consider these gaps in his treatment because he testified the gaps were due to "insurance problems,"
citing *Orn*, 495 F.3d 625.  While the Ninth Circuit held in *Orn* that a claimant's failure to obtain
medical treatment during a period when he had no medical insurance cannot be used as a basis for
finding her testimony not credible, such was not the case here.  Plaintiff's testimony is not that he
was without health insurance from July 2016 to September 2017.  Instead, he testified that his
primary physician (Dr. Trinh) moved away, and, *due to his insurance*—not lack thereof—it "took
a while" before he could see another doctor (N.P. Greaves).  (AR 54.)  There is no indication in the
record that during the time it took Plaintiff to change providers, he could not have sought treatment
from an emergency department or urgent care clinic, as he had in September 2015 and March 2016.
(*See* AR 262–74; 300–08.)

Even if these gaps in treatment were not a legitimate reason for the ALJ to discount
Plaintiff's testimony, the error is harmless because the ALJ provided several other valid reasons for
discrediting Plaintiff's testimony, as set forth below.  *See Molina*, 674 F.3d at 1115 (harmless error
when ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also
provided valid reasons that were supported by the record).

**b.      Conservative Treatment**

Another reason given by the ALJ for discrediting Plaintiff's subjective statements—
unaddressed in Plaintiff's briefing—is that he "has not generally received the type of medical
treatment one would expect given his allegations."  (AR 29.)  The ALJ noted that in September
2015, following his visit to the emergency department for his back pain, he was prescribed pain
medication and daily exercises were recommended.  (AR 29, 264.)  In March 2016, after another
emergency room visit, he was provided educational materials related to his conditions and
discharged in stable condition.  (AR 302.)  Plaintiff reported to the consultative examiner that he
was treating his pain mainly with rest and medication, and he had received no chiropractic
treatment, physical therapy, acupuncture, or injections to the back.  (AR 275.)

The record shows that in May 2016, treating physician Dr. Trinh referred Plaintiff to a
physical therapist for his low back pain and prescribed a cream and medications.  (AR 30, 292,
348, 365, 366.).  In July 2016, Dr. Trinh again referred Plaintiff to a physical therapist for his low

back pain and prescribed medications.  (AR 342, 360.)  As the ALJ observed, N.P. Greaves also referred Plaintiff to physical therapy in October 2017 for his lumbago with sciatica and recommended that he use a heating pad or warm shower to relax muscles.  (AR 31, 324.)  At the hearing, Plaintiff testified that no doctor has ever suggested surgery or injections for his back, and that he takes medication (Ibuprofen and Baclofen) and warm showers to help with his back.  (AR 61–62.)

Based on the above-described conservative treatment, which is supported by the record (and Plaintiff does not contest), the ALJ was entitled to discount Plaintiff's credibility.  *See, e.g., Tommasetti*, 533 F.3d at 1040 (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset"); *Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment); *Johnson,* 60 F.3d at 1434 (ALJ may properly rely on the fact that only conservative treatment has been prescribed); *Jones v. Comm'r of Social Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility).  Accordingly, the ALJ's adverse credibility determination based on Plaintiff's conservative treatment will not be disturbed.

### c.      Lack of Compliance with Treatment

The ALJ's final ground for discounting Plaintiff's credibility is that the alleged severity of his impairments is inconsistent with evidence showing that "he did not follow through with doctor recommendations."  (AR 32.)  The ALJ noted that Plaintiff's treating physicians Dr. Trinh and N.P Greaves referred Plaintiff to physical therapy on multiple occasions, but he testified at the that he never went.  (AR 30, 54, 292, 324, 338, 342, 348, 360, 365, 366.)  Dr. Trinh also referred Plaintiff to an ophthalmologist for his vision problems (AR 30, 292, 348), but there is no record that he sought treatment from such a provider.  (*See* AR 58.)  Plaintiff testified at the hearing that he previously had new glasses but lost them and had not yet replaced them.  (AR 58.)

1    In evaluating a claimant's claimed symptoms, an ALJ may consider a claimant's failure to

2 follow a prescribed course of treatment when weighing a claimant's credibility. *See Tommasetti*,

3 533 F.3d at 1039–40; *Johnson*, 60 F.3d at 1434.  In so doing, however, an ALJ must consider a

4 claimant's explanation for failing to undergo the recommended treatment. *See Smolen*, 80 F.3d at

5 1284.  As the Ninth Circuit explained in *Fair v. Bowen*, it is the claimant's burden to adequately

6 explain his or her failure to follow a prescribed course of treatment. 885 F.2d at 603 (claimant's

7 failure to explain failure to seek treatment or follow a prescribed course of treatment can "cast

8 doubt" on the sincerity of his testimony); *see also Smolen*, 80 F.3d at 1293.  An ALJ may discount

9 a claimant's credibility due to an "unexplained or inadequately explained failure to seek treatment

10 or to follow a prescribed course of treatment." *Tommasetti*, 533 F.3d at 1039.

11    Here, Plaintiff's briefing does not address the ALJ's reliance on evidence of Plaintiff's lack

12 of compliance with treatment as reason to discredit his subjective complaints.  Plaintiff therefore

13 proffers no explanation for his failure to follow his prescribed course of treatment.  As Plaintiff has

14 not met his burden of adequately explaining his failure to follow his treatment regimen, *see Fair*,

15 885 F.2d at 603, and viewing the record as a whole, the Court finds that ALJ's conclusion that

16 Plaintiff was non-compliant with his doctors' recommended course of treatment is supported by

17 substantial evidence.  The ALJ's determination that Plaintiff was non-compliant with treatment is

18 therefore another clear and convincing reason for discounting Plaintiff's subjective symptom

19 testimony. *Tommasetti*, 533 F.3d at 1039.

20    In sum, the Court finds that the ALJ offered multiple clear and convincing reasons to

21 discredit Plaintiff's testimony regarding the extent of his limitations.  While Plaintiff may disagree

22 with the ALJ's interpretation of the medical evidence (*see* Doc. 16 at 17–18), it is not within the

23 province of this Court to second-guess the ALJ's reasonable interpretation of that evidence, even

24 if such evidence could give rise to inferences more favorable to Plaintiff. *See Rollins*, 261 F.3d

25 at 857 (citing *Fair*, 885 F.2d at 604).

26                              **V.      CONCLUSION AND ORDER**

27    After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of

28 the record, the Court finds that the ALJ's decision is supported by substantial evidence and is

therefore AFFIRMED.   The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **July 30, 2020**                                    /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE